Daniel H. Axelroad and Jeanne S. Axelroad v. Commissioner.
Axelroad v. Commissioner
Docket No. 87565.
United States Tax Court
T.C. Memo 1962-118; 1962 Tax Ct. Memo LEXIS 190; 21 T.C.M. (CCH) 626; T.C.M. (RIA) 62118; May 18, 1962
S. Jarvin Levison, Esq., 1116-24 First National Bank Bldg., Atlanta, Ga., for the petitioners. George W. Calvert, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in income tax and additions to tax as follows: Additions to Tax
Year
Income Tax
(Section 6653(a)) [1]
1956
$59,644.99
$2,982.25
1957
19,645.43
982.27
1958
10,372.65
518.63
$89,663.07
$4,483.15
The only issue presented for our consideration is the determination of the correct amount of petitioners' gross profit from the retail liquor business. Findings of Fact Some of the facts have been stipulated and are so found. *191 Daniel H. Axelroad (hereinafter sometimes referred to as petitioner) and Jeanne E. Axelroad resided in Atlanta, Georgia, during the years 1956, 1957, and 1958 and filed their 1956, 1957, and 1958 Federal income tax returns with the director of internal revenue, Atlanta, Georgia. Jeanne S. Axelroad is involved herein solely by reason of having filed joint returns with petitioner for the years in issue. Petitioner obtained a retail liquor license from the State of Georgia in May 1951, and thereupon commenced operation of a retail liquor store in Atlanta known as Red Circle Liquor Store. The store also sold small amounts of wine and ginger ale. [2]
Minimum prices for retail liquor sales were set by the revenue department of the State of Georgia. From October 1956 to the end of the period here at issue the regulations promulgated by the State revenue commissioner provided: 703. The minimum retail price of each *192 type, brand, and size of distilled spirits shall be not less than the cost thereof to the retailer, as hereinafter defined, plus a markup of 27% of such cost. The cost to the retailer shall be the total paid by him to his wholesale supplier for such distilled spirits excluding State sales taxes and municipal and county excise taxes. A reduction in the wholesale price of any type, brand, and size of distilled spirits to a retailer which is in effect for no longer than one month shall not require a corresponding change in the minimum retail price thereof, but when such wholesale price is maintained at a reduction for two consecutive months, it shall constitute a price reduction which must be reflected in the minimum retail price thereof. The wholesale price to the retailer shall not be reduced in any price change by an amount in excess of 10% of the current price. From 1951-1953 petitioner sold liquor "over-the-counter" (one or two bottles per sale) at prices in accordance with the regulations then in effect. His sales of all beverages for those years were: Sales
Year
(Nearest Dollar)
1951 (7 months)
$39,858
1952
63,486
1953
51,337 Some of these sales were *193 made to friends at 10 percent discounts. Sometime during 1954, petitioner became dissatisfied with the existing volume of business and began selling liquor in quantity to various local clubs and restaurants at prices below those permitted by State law, generally at 10 percent above his cost. He also engaged in selling liquor to "bootleggers" who would purchase it from him in cases and resell it in the dry counties of Georgia. [3] The prices charged to these "bootleggers" were, with infrequent variations, $3, $4, and $5 above petitioner's cost. The sales to "bootleggers" were larger than the club sales. Such sales to clubs and "bootleggers" (hereinafter called "quantity sales" when referred to collectively) continued throughout the years in issue. Petitioner continued selling "over-the-counter" (including sales to friends at a 10 percent discount) at the retail prices prescribed by the State regulations. The latter category constituted a comparatively small portion of his total sales, averaging about $55,000 per year. Petitioner's sales volume for the years 1954-1958 was as follows: Sales
Year
(Nearest Dollar)
1954
$109,541
1955
247,916
1956
604,868
1957
340,125
1958
238,896
*194 In 1955, Federal liquor authorities fined petitioner approximately $7,000 for selling liquor in wholesale quantities without the proper license. The fine was paid in 1956 and 1957. Shortly after petitioner's apprehension by the Federal authorities, the State revenue commissioner commenced a similar proceeding against petitioner but it was dismissed in early 1956 and the State did not disturb his operations thereafter until July 1959, when his license was revoked. The "over-the-counter" sales (hereinafter referred to as "register" sales) were regularly rung up on the cash register which accumulated daily totals. These totals were then regularly entered into "books" kept by petitioner. These "books" were used in computing petitioner's liability for Georgia sales tax but not for purposes of preparing petitioner's Federal income tax returns. The quantity sales were never rung up on the cash register. As these sales were made, petitioner or his clerk would record the amount thereof on a slip of paper. These slips were kept in a box until such time as petitioner found an opportunity (at irregular intervals) to record them in another set of "books." [4] The slips were then destroyed. *195 The "books" so kept were incomplete but they were used only for petitioner's information and were received in evidence to corroborate his testimony that some sales were made at less than the markup required by State law. They were not given to petitioner's accountant and played no part in his determination of sales on petitioner's tax returns. In pricing liquor for register sales petitioner would adhere rather rigidly to the suggested retail prices contained on the invoices from the wholesalers. Such prices were usually 30 percent above invoice cost (not counting sales tax) for liquor and slightly higher for wine and ginger ale. In pricing liquor for quantity sales, petitioner would add the indicated markup to the invoice price (i.e., 10 percent over cost for "club" sales; $3 to $5 per case profit for "bootleg" sales). Prior to November 1956, the Georgia sales tax of 3 percent was collected by the "retailers" (such as petitioner). Petitioner did not add such tax to the price he charged on quantity sales, but did turn the correct amount over to the State. However, after November *196 1956, Georgia changed its system and required the wholesaler to collect the sales tax on the liquor, retaining its earlier system as to other beverages. Thenceforth, petitioner would add his sales tax cost (together with certain local assessments totaling a little over $1 per case) to the price he charged on quantity sales. The bulk of petitioner's liquor purchases were paid for by checks drawn on his business bank account. However, due to the fact that several of his checks were returned by the bank because petitioner's funds on deposit were insufficient to cover them, petitioner was obliged to make some purchases in cash. This was especially true in 1956. The wholesale purchases for quantity resale were made primarily in response to "orders" received. Petitioner did not carry a significant stock of cases for these purposes; rather his inventory consisted largely of less-than-case quantities of various brands and types of liquor. Often, petitioner would receive "orders" from clubs or "bootleggers" which were required to be filled on rather short notice. In such instances he would request the wholesaler to deliver the liquor directly to his customer who would pay the wholesaler *197 directly. The wholesaler would then give petitioner an invoice showing the cost of the liquor and one of the wholesaler's delivery men would give petitioner his per case profit in cash. These invoices were not recorded as purchases but the profit thereon was deposited in petitioner's business bank account. Petitioner's purchases (including cash purchases) of liquor were: Year
Amount
1956
$569,055.00
1957
290,896.92
1958
205,444.82
Petitioner's Federal income tax returns were prepared by a certified public accountant. The accountant had devised a rather slipshod system of bookkeeping under which, as we have mentioned, the "sales books" of petitioner were not used in preparing the returns. Rather, sales were determined by reference to the amounts deposited in petitioner's business bank account. The amount so determined was adjusted by (1) the variation in cash-on-hand at end of year as compared to beginning; and (2) the amount of cash purchases of liquor, etc., and of cash "payouts" for miscellaneous expenses as reflected by off-hand records maintained by petitioner. [5] Purchases were determined by simply entering all the checks petitioner drew for liquor, *198 etc., and adding thereto the cash purchases. No independent check on the accuracy of sales or purchases thus reported was ever made by the accountant. Petitioner ascertained the opening and closing inventories by listing all the liquor in his stock at its retail shelf prices and totaling the amounts so determined. The accountant would then convert these totals into cost figures, assuming an average gross profit on the retatil price of about 22 percent. The accountant then made no further or independent investigation but prepared the returns from the figures so determined. To ascertain the accuracy of the resulting gross profit amounts, the accountant resorted to petitioner's books on register sales (these books were not otherwise used in preparation of the returns) to see what portion of the total reported sales was made at the markup prescribed by State regulations. The *199 remainder (and larger portion) of the sales, he knew, were made at substantially lower markups. Thus, in a rough way, the accountant sought to verify the accuracy of the reported gross profit. Respondent's notice of deficiency stated: In the absence of adequate records, your taxable net income has been computed upon the basis of 22 per cent of sales representing gross profit during the taxable years ended December 31, 1956, 1957 and 1958. * * *
Explanation of Adjustments (a) In the absence of adequate records it has been determined that your gross profit from retail liquor sales for the taxable year ended * * * is not less than 22 per cent of your reported gross sales of * * *, or * * *. Since you reported gross profit of only * * * on your * * * return, your profit from business has been increased by the difference of * * *. Reported gross sales thus used by respondent were $587,876.49, $320,988.48, and $230,266.56 for 1956, 1957, and 1958, respectively. Respondent considered the difference between gross profit so computed and gross profit shown on the return to be the understatement of income per year. Deficiencies were determined accordingly. Respondent's answer merely *200 restates his position in the deficiency notice. Ultimate Facts As to the sales on which only the profit was reported (cost being thus eliminated from both income and cost of goods sold), we find as follows: Gross profit
(Amount deposited
Sales
and included in
Year
Cost
Price
reported sales)
1956
$12,442
$13,562
$1,120
1957
13,937
15,191
1,254
1958
3,429
3,737
308
As to quantity sales (apart from the above sales), we find as follows: Year
Sales
Gross Profit
1956
$536,306
$42,950
1957
269,934
21,600
1958
180,159
16,000
The gross profit on yearly register sales of $55,000 was $13,000 a year Hence we find the total gross profits from petitioner's business were: Year
Amount
1956
$57,070
1957
35,854
1958
29,308
The enforcement of the State regulations (above quoted) regarding minimum retail prices for liquor was lenient during the years in issue. Petitioner's returns showed gross profits of $36,170.81 (6.2 percent on sales), $27,866.94 (8.2 percent on sales), and $18,791.71 (8.2 percent on sales) for the years 1956, 1957, and 1958, respectively. Opinion Respondent *201 relies upon section 446 [6] as authority for computing petitioner's gross profit by reference to the percentage profit on sales. There can be but little doubt that petitioner's "bookkeeping" system did not constitute an ordinary method of reflecting income. Petitioner readily admits this throughout. Manifestly, there were no means of verification of the reporting of sales or purchases. This being a cash business, the likelihood of omission was thus especially great. , affd. (C.A. 6, 1957). The inventory totals are supported only by petitioner's own book entries. Cf. ; . With such obvious chances for error, it is clear that respondent could, under the authority of section 446, resort to a method divorced from petitioners' books and records to compute their income. ; ; (C.A. 6, 1957), affirming a Memorandum Opinion of this Court. *202 We have long recognized the validity of the computation of gross profit by reference to an established percentage profit on sales. See e.g., ; . However, while respondent's discretion in this area is broad, it is clear that his determination must have a reasonable basis and cannot be sustained if it is arbitrary. . The notice of deficiency read together with other pleadings filed by respondent raises no issue as to the correctness of the amount of gross sales reported by petitioners. Rather, as we read it, *203 it plainly attacks nothing more than the gross profit reported on an agreed amount of sales. On brief, however, respondent seeks to hedge by stating: * * * the respondent determined in the statutory notice that [petitioner's] gross profit from liquor sales in each year was not less than 22 per cent of the reported gross sales on the returns. In other words, the respondent determined a minimum gross profit for each year. In so doing, the respondent has not accepted the sales or the cost of goods sold items (inventories and purchases) as being correct. The sales figure in each return has been used merely as a tool to arrive at the minimum gross profit used in the statutory notice. [Italics supplied by respondent.] He then argues: * * * the petitioner has lost sight of the fact that the respondent's determination did not accept the sales on the return as correct when the 22 per cent was applied thereto to get a minimum gross profit. Under these circumstances, the petitioner cannot gain even if he were to show that the 22 per cent was excessive and arbitrary. He might gain upon such a showing if the respondent had applied the percentage to a sales figure that the respondent conceded *204 as correct, which was not the case in this proceeding. Here, he has the burden of proving the correctness of sales as well as the cost of goods sold. [Italics in last sentence supplied by the Court.] Yet he still contends on reply brief that: In other words, the method used by the respondent does not result in any tax being levied on the unreported sales. * * * Thus, respondent takes the position that his notice of deficiency placed in issue the amount of gross sales as well as the gross profit thereon. Respondent maintains that if petitioners were uncertain as to the precise scope of the pleadings they should have employed our Rule 17 [7] to clarify the matter. Cf. . However, such use of our rule is necessary only where there is some doubt as to the position of the other party relative to an issue. We refuse to so expand the natural interpretation of the deficiency notice to infer such doubt simply from the phrase "not less than 22 per cent of your reported gross sales." This challenge is not addressed to the gross sales reported. Rather, we believe that any intelligent reading of this notice would suggest that only the proper *205 gross profit margin on agreed sales was at issue. Petitioner was entitled to so read the notice and thus had no inkling that a resort to Rule 17 was necessary. Respondent argues that the deficiency notice as written raised the issue of gross sales because of the presumptive correctness of respondent's total determination. It is settled that when respondent determines a deficiency (which is presumptively correct) we must sustain such deficiency if it is correct even though for a reason different from that set forth in the notice of deficiency. , reversed on another issue (C.A. 8, 1942). From this premise, respondent argues, in effect, *206 that we must sustain his gross profit determination whether or not his percentage profit determination is correct. His position is that even were we to find that the determined percentage profit on reported sales (22 percent) was set too high, the gross profit amount would still be presumptively correct because we would then simply presume higher gross sales to be multiplied by the lower percentage. Stated otherwise, respondent's position is that whatever we determine to be petitioner's percentage profit, we come to the same result because respondent's presumption of correctness thus requires us to adjust sales accordingly. This approach has no basis in reality for it is incredible that while both gross sales and the percentage profit thereon were varied in indeterminate amounts, that gross profit in dollars would remain static. We cannot see how respondent's effort to play both ends against the middle and to support his determination by means of a sliding "can't lose" presumption based upon two variables bearing no given relationship to each other can be anything but arbitrary. The determination, to the extent based upon two variables, is thus arbitrary and cannot be accorded any *207 presumption of correctness. ; . From the foregoing it follows that respondent cannot avail himself of the presumption of correctness in so far as gross sales are concerned. His belated effort to charge petitioner with higher than reported sales raises an issue outside the purview of his deficiency notice and must be regarded as new matter on which respondent bears the burden of proof under our Rule 32. . There has been no showing as to the correct amount of gross sales and (respondent being entitled to no presumption on this point) we must thus accept petitioner's sales figures as correct. [8]
In this posture of the case, the only issue before us is the proper amount of gross profit on an agreed and accepted *208 amount of sales. We thus turn to a consideration of the gross profit percentage maintained in petitioner's business. Respondent has relied primarily upon the regulations of the State of Georgia (quoted in our findings) to sustain his computation based on 22 percent gross profit on sales (which is approximately 27 percent on cost). Petitioner contends, however, that such regulations were not being enforced during the years in issue and that he, in fact, sold most of his liquor in quantity at prices substantially below the prescribed retail minimum. It is now settled that if persuasive proof of such fact is made by petitioner he must prevail for he can be compelled to include in gross income only his actual receipts and not the theoretical legal minimum prices. , and cases there cited. On this issue of course petitioner bears the burden of proof. On this record, we think he has adduced sufficient affirmative evidence to carry such burden. The "books" in which petitioner ultimately recorded the quantity sales are in evidence. Concededly, they are incomplete and cannot form a basis for our determination of the profit on *209 such sales. However, the purpose of their introduction into the record was merely the corroboration of the fact that this type of sale did occur. We feel that they are effective in accomplishing this objective. Respondent makes numerous objections to these "books," concluding that they are lacking in authenticity. It is true that many entries therein were made at the same time and sometimes in reverse chronological order but this has been explained by the circumstance that petitioner first entered such sales on small slips of paper and then recorded such papers only at irregular intervals. Respondent also points out that the entries in the "books" are in ink of many different colors (or in ink and pencil mixed) even on the same line. This circumstance we find, however, to be more consistent with the making of periodic entries than with respondent's suggestion that all the entries in the "books" were fabricated for the purpose of this proceeding. On the whole, having studied the "books" in considerable detail and having observed the demeanor of the witness (petitioner) who testified as to their preparation, we find a ring of authenticity in these records and we believe them to corroborate *210 the occurrence of such quantity sales. [9]
Furthermore, this evidence does not stand alone in corroborating the existence of quantity sales. The marked increase in petitioner's sales volume starting in 1954 lends credence to the contention that *211 petitioner had then embarked upon a broader selling program than that in which he had theretofore been engaged. The Federal fine, petitioner's purchase of a Federal wholesale permit, and the subsequent State investigation ultimately resulting in the loss of petitioner's retail license further support the theory that his sales were not all at prescribed markups. In finding cost of purchases we have accepted as proven only those purchases which respondent necessarily admits because based on State records. Even under these findings, respondent's theory (as to percentage of gross profit) would mean that petitioner's ending inventories were (approximately) $101,000, $49,000, and $31,000 for the years 1956-1958, respectively. This seems rather unlikely to us in view of petitioner's uncontradicted testimony (reflected in our findings) that he could not afford to carry large inventories and that most purchases from wholesalers were made only as orders were received by petitioner from his customers. The opening inventory reported on petitioner's 1956 return was but $7,620. We find abundant support in the record for petitioner's contention that, during the years in issue, the Georgia liquor *212 authorities condoned violations of the retail price regulations. Petitioner has so testified. Petitioners' Georgia income tax returns are in evidence and they reveal gross profit margins identical with those disclosed in the Federal returns. The State revenue commissioner had jurisdiction over enforcement of the liquor laws, as well as over the State income tax laws, and yet he accepted these returns and similar returns filed by other retail liquor dealers which failed to reflect a 22 percent gross profit margin. We thus conclude that the average margin on gross sales was less than 22 percent. The evidence is completely lacking in any specifics from which we can determine the precise margin. We have thus been obliged to do the best we can with the little evidence at hand. We have taken into account that the markups on quantity sales in 1956 were computed with reference only to the liquor cost and there was thus no profit on the sales tax. We have borne heavily against petitioner by arriving at cost of goods sold solely from liquor purchases proven by State records, thus disregarding, inter alia, purchases of wine and ginger ale. Likewise, we have made only slight adjustment for those *213 register sales which were made at 10 percent off the retail price and we have considered the slightly higher markups on wine as compared to liquor. Using the information available, we have exercised our own best judgment bearing heavily against the taxpayer, as the inexactitude was of his own making, and have made our findings as to gross profits for the years in issue. (C.A. 2, 1930). A minor adjustment has been conceded by petitioners and can be reflected in the Rule 50 computation. The allowable medical deduction depends upon the effect of our findings on petitioners' adjusted gross income. It can now be computed in accordance therewith. The addition to tax under section 6653(a), liability for which is not contested by petitioners, can be computed under our Rule 50 decision. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954.↩
2. The term "liquor" is hereinafter used to refer to all types of whiskey and "hard" alcoholic beverages. It does not include wine or ginger ale. The purchases and sales in the latter category were minimal and will be disregarded herein except where otherwise noted.↩
3. Only 20 of the 159 counties in the State of Georgia were "wet."↩
4. The entries in these "books" reflect only the cost price per case of liquor and the profit thereon.↩
5. Cash withdrawals were made by petitioner in the amounts of $4,550, $5,200, and $5,200 for the years 1956-1958, respectively. These amounts have been included in the sales totals in our findings although, under the accountant's system, they were not included in the sales figure reported on the return.↩
6. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule. - Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) Exceptions. - If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.↩
7. RULE 17. AMENDED AND SUPPLEMENTAL PLEADINGS. (c) Amendment ordered. - (1) Occasion for. - The Court upon its own motion, or upon motion of either party showing good cause filed prior to the setting of the case for trial, may order a party to file a further and better statement of the nature of his claim, of his defense, or of any matter stated in any pleading. Such a motion filed by a party shall point out the defects complained of and the details desired.↩
8. To the extent the proof has shown them to be incorrect we have increased the reported sales figures in making our findings. Thus we have raised sales by (1) the amount of cash found to be withdrawn and unreported by petitioner; and (2) the cost of the goods sold pertaining to sales upon which only the profit was reported by petitioner.↩
9. It is true that none of the "bootleggers" or club owners testified. But many of the names of these purchasers on petitioner's records were fictitious for obvious reasons. It would be rather naive for us to expect petitioner to produce these witnesses even assuming he could somehow locate them. This difficulty in proof, of course, does not relieve petitioner of the obligation to establish his case. . It does, however, make us less inclined to draw adverse inferences from petitioner's non-production of these witnesses. Cf. , affd., (C.A. 10, 1947). Likewise, we can give little significance to the fact these sales were kept in separate records. Cf. , reversed on another issue sub. nom. (C.A. 6, 1957).↩